UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-60179-CR-COHN

UNITED STATES

v.

MAURICE JERMAINE HARRIS,

    Defendant.

_____/

## ORDER GRANTING MOTION TO SUPPRESS

**THIS CAUSE** is before the Court upon Defendant Maurice Harris's Motion to Suppress Search of Vehicle and Seizure of Evidence [DE 29] ("Motion"). The Court has considered the Motion, the Government's Response [DE 32], the testimony of Officer Joseph Pein, and the exhibits admitted at the evidentiary hearing on October 26, 2018. The Court has heard argument from counsel and is otherwise advised in the premises.

### I. FINDINGS OF FACT

The Court finds by a preponderance of the evidence the following facts:

1.    Joseph Pein is a certified canine officer with the Wilton Manors Police Department, and has been so employed for approximately four years.

2.    On January 27, 2018 at approximately 5:40 p.m., Officer Pein pulled over a black Honda Civic being driven by Defendant Maurice Harris near the 2900 block of NW 9th Avenue in Wilton Manors, Florida. Mr. Harris's two young daughters were in the car with him.

3.    The traffic stop was captured by Officer Pein's dashcam recorder.

4. At 5:42 p.m., Officer Pein approaches the driver's side window of Mr. Harris's car and advises him that the reasons for the stop are (1) Mr. Harris's dark tinted windows, (2) expired tag, and (3) obscured license plate.

5. Officer Pein then performs a test using a hand-held device on Mr. Harris's window tints, which confirms that they are illegal.

6. At 5:43 p.m., Officer Pein asks whether Mr. Harris has ever been arrested before. Mr. Harris confirms that he was previously arrested for possession of "molly" (MDMA). Officer Pein then asks Mr. Harris whether he has anything illegal in the car and Mr. Harris states that he does not.

7. Officer Pein testified at the Motion to Suppress hearing that Mr. Harris became nervous when he was asked about his criminal history. Officer Pein noted that Mr. Harris began "talking with his hands" at this point and was "kind of just going around the whole thing." The dashcam video confirms, however, that the back and forth about Mr. Harris's criminal history took only about forty seconds. Mr. Harris initially expressed reluctance to get into the subject, stating that he had been arrested but it was not anytime recently, but he then answered Officer Pein's questions regarding his criminal history and was not misleading or evasive.

8. Officer Pein also testified that the city of Wilton Manors is a high drug trafficking area.

9. At 5:44 p.m., Officer Pein returns to his patrol car and starts conducting records checks on his computer and writing the traffic citations.

10. At 5:51 p.m., a second officer—Officer Findlan—arrives at the scene. Both officers approach Mr. Harris's car, with Officer Pein at the driver's side window.

Officer Pein again asks Mr. Harris if there is anything illegal in the car. When Mr. Harris responds that there is not, Officer Pein asks whether he can "check real quick" and asks Mr. Harris to step out of the car. Mr. Harris asks Officer Pein why he has to search his car, and Officer Pein responds that it is "because you have a drug history, that's it."

11. At 5:52 p.m., Mr. Harris says that he only has one drug charge and asks how long it has been. Officer Pein informs him that it has been two-and-a-half years since his drug arrest. Mr. Harris then tells Officer Pein that he doesn't "feel right letting you search." Officer Pein then instructs Mr. Harris to "still hop out because now I'm going to do a dog sniff." When Mr. Harris again states that there is nothing in the car, Officer Pein tells him "listen to me, I'm going to arrest you for obstruction, okay? You have to get out of the car because I don't want my dog to bite you in the face. Alright? That's it."

12. At the Motion to Suppress hearing, Officer Pein testified that another reason he wanted Mr. Harris to exit the car was for his (Officer Pein's) own safety.

13. Mr. Harris then asks Officer Pein for permission to call his "chick . . . just in case so she can come get the kids." Officer Pein questions why Mr. Harris would need to call his wife if there is nothing in the car, and Mr. Harris responds that it is because Officer Pein has threatened to arrest him for obstruction. Mr. Harris calls his wife and asks her to "come, just in case I get arrested for obstruction."

14. At 5:53 p.m., Mr. Harris exits his car flanked by both officers, and Officer Pein pats him down. Mr. Harris then walks to the front of Officer's Pein's car with Officer Findlan while Officer Pein begins to remove Mr. Harris's daughters from his car. Mr. Harris is then asked to sit on the sidewalk with his daughters, near Officer Findlan.

3

15. At 5:55 p.m., Officer Pein asks Officer Findlan to continue writing the traffic citations for him on his (Officer Pein's) computer.

16. Mr. Harris then asks Officer Pein to retrieve a jean jacket from the car for his daughters. Officer Pein obliges, but before handing the jacket to Mr. Harris, he asks him whether there is anything inside of the jacket. Mr. Harris responds that there is not. Officer Pein asks whether he can check, and Mr. Harris consents.

17. Officer Pein searches the jacket's pockets and, at 5:56 p.m., finds a Florida driver's license belonging to an elderly white male (Mr. Harris is a young black male). He asks Mr. Harris who that person is, and Mr. Harris responds that the license is not his and that he had found it. Officer Pein then asks Mr. Harris why he would keep the license, and Mr. Harris responded that he did not know what to do with it.

18. At 5:57 p.m., Officer Pein brings his dog, Rozi, to Mr. Harris's car.

19. Rozi's behavior changes near the front passenger side door and Officer Pein informs Mr. Harris that she alerted there. He asks Mr. Harris if he can let the dog sniff the interior of the car, and Mr. Harris consents.

20. At 5:59 p.m., Officer Pein returns Rozi to his car and begins to search the interior of Mr. Harris's car. During this search, he smells marijuana in the car. Officer Pein had not smelled marijuana prior to this point.

21. At 6:00 p.m., Officer Findlan comes to Mr. Harris's car and asks Officer Pein for the password to his computer because it had crashed.

22. At 6:13 p.m., Mr. Harris asks whether the fact that he has been arrested for possession one time means that he will always have to be searched. Officer Pein responds, "when you've been arrested before, there's always a suspicion that maybe

you have it again." Officer Pein also states that "there's people who have never in their lives been arrested for it [narcotics] and I do the same thing. It has nothing to do with [Mr. Harris] as an individual but it is what it is."

23. While Officer Pein did find cigar wraps or "blunt wraps," no drugs were discovered or seized. Rather, the search of Mr. Harris's car revealed a note book containing various credit cards and forms of identification belonging to third parties.

24. At 6:26 p.m., Mr. Harris is placed in handcuffs and taken away.

## II. DISCUSSION

Defendant seeks to suppress the physical evidence that was gathered as a result of the search "on grounds that Officer Pein unlawfully extended the scope and prolonged the traffic stop without reasonable suspicion of criminal activity . . ." DE 29 at 5. The Government seems to acknowledge that the traffic stop was prolonged in order for Officer Pein to conduct the dog sniff of the exterior of Mr. Harris' car. See DE 32 at 6 ("There were delays caused by Officer Pein removing the children from the car, Harris not wanting to come out of the car, and the crash of the computer in Officer Pein's car."). But nevertheless, the Government contends that "[t]hroughout the duration of the stop both Officer[s] Pein and Findlan were diligent in pursuing the traffic-related portion of the stop because while Officer Pein was conducting the search of the vehicle, Officer Findlan was writing the citations." Id. The Government also asserts that, regardless of whether the stop was prolonged for the dog sniff, Officer Pein had a reasonable suspicion to conduct the dog sniff "based on Harris's past criminal history regarding possession of narcotics, his observation that Harris became more nervous when asked about his criminal history, and the fact that Wilton Manors is known to Officer Pein for narcotics activity." Id.

The Court finds that Officer Pein did impermissibly extend the stop, without reasonable suspicion, in order to conduct the dog sniff. The Court will therefore grant the Defendant's Motion.

**A.     Standard**

The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV. "When police stop a motor vehicle, even for a brief period, a Fourth Amendment 'seizure' occurs." United States v. Moore, 570 Fed. Appx. 848, 849 (11th Cir. 2014) (citing Whren v. United States, 517 U.S. 806, 809–10 (1996)). "A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). But "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." Id. (citation omitted). While a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 1615. Likewise, while "[t]he use of a well-trained narcotics-detection dog during a lawful traffic stop, generally does not implicate legitimate privacy interests," Illinois v. Caballes, 543 U.S. 405, 409 (2005), a traffic stop may not be prolonged to conduct a dog sniff absent reasonable suspicion. Rodriguez, 135 S. Ct. at 1616.

Reasonable suspicion is "a particularized and objective basis" for suspecting the person stopped of criminal activity. United States v. Cortez, 449 U.S. 411, 417–18 (1981). It must be more than a hunch, but "the likelihood of criminal activity need not

rise to the level of probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002). In evaluating an officer's actions, the Court does not consider each observation in isolation but instead looks to the totality of the circumstances. United States v. Lopez-Garcia, 535 F.3d 1306 (11th Cir. 2009).

**B.    Analysis**

Here, it is clear that Officer Pein's initial decision to stop Mr. Harris's car was reasonable based on the traffic violations. Whren, 517 U.S. at 809 (explaining that a police officer's initial decision to stop a motor vehicle "is reasonable where the police have probable cause to believe that a traffic violation has occurred."). And it is equally clear that Officer Pein had probable cause to search Mr. Harris's car either: (1) after he found a stranger's driver's license in the jacket he removed from Mr. Harris's car (approximately 16 minutes into the stop); or (2) after his dog alerted on the exterior of Mr. Harris's car (approximately 17 minutes into the stop). See United States v. Lopez, 649 F.3d 1222, 1245 (11th Cir. 2011) ("A sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place."). The critical question is whether Officer Pein had already impermissibly prolonged the stop prior to these events. If so, the evidence obtained by Officer Pein must be suppressed as the evidentiary fruits of an unconstitutional stop.

First, the Court rejects the Government's contention that "the stop was not extended in order to conduct the dog sniff." DE 32 at 6. It plainly was. The Government relies heavily on the facts that: (1) only approximately sixteen minutes

7

elapsed from the time Officer Pein stopped the car to the time his dog alerted to the odor of drugs; and (2) "while Officer Pein was conducting the search of the vehicle, Officer Findlan was writing the [traffic] citations." Id. at 6-7. But the relevant inquiry is not how much time had passed prior to the dog being deployed or alerting. Rather, the Court must determine whether the stop was prolonged, by any length of time, in order to conduct the dog sniff. See Rodriguez, 135 S. Ct. at 1616 (explicitly rejecting a *de minimis* exception and remanding for determination of whether "seven or eight minute" delay for dog sniff was justified by reasonable suspicion). And the Court agrees that if Officer Findlan had been writing the traffic citations during the entire period of time that Officer Pein was conducting the dog sniff **and** removing Mr. Harris's children from the vehicle in order to facilitate the dog sniff, then the dog sniff would not have prolonged the stop. But there was unquestionably a period of time (albeit a brief one) before the dog sniff during which neither officer is pursuing matters related to the traffic violations.

At 5:51 p.m., both officers approached Mr. Harris's car and Officer Pein asked for permission to conduct a search. Of course, this was a search aimed at rooting out a drug offense, not one related to addressing a traffic violation.[1] The Government notes that part of the delay during this time period was caused by Mr. Harris "not wanting to come out of the car." DE 32 at 6. True enough. But even if the Court disregarded the time during which Mr. Harris lawfully exercised his right to refuse to consent to the search, was ordered to exit the vehicle, and then threatened with an obstruction of justice charge if he refused to comply, there was still a delay of approximately two minutes between the time Mr. Harris complied with the command to exit his car and

---

[1] Officer Pein had already determined that Mr. Harris's window tints were illegal and confirmed that his tag was expired.

when Officer Pein asked Officer Findlan to resume writing the traffic citations. During this time, Officer Pein patted Mr. Harris down and removed his children from the car while Officer Findlan stood nearby.

The Government argues that Officer Pein was permitted to order Mr. Harris and his children to exit the vehicle. Id. (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009)). It is certainly true that "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . . including requiring the driver and passengers to exit the vehicle 'as a matter of course.'" Spoerke, 568 F.3d at 1248. But the reason why Officer Pein removed Mr. Harris and his children from the car matters. As the Supreme Court explained in Rodriguez:

> Unlike a general interest in criminal enforcement . . . the government's officer safety interest stems from the mission of the stop itself. Traffic stops are 'especially fraught with danger to police officers' . . . so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. On-scene investigation into other crimes, however, detours from that mission. ***So too do safety precautions taken in order to facilitate such detours.***

Rodriguez, 135 S. Ct. at 1616 (emphasis added and internal citations omitted). Here, although Officer Pein removed Mr. Harris and his children from the car as a safety precaution, it was not a precaution he took in order to safely complete his traffic-stop mission. Rather, he took this safety precaution in order to facilitate the dog sniff, an investigation into other crimes and "detour" from his traffic-stop mission. In doing so, he prolonged the stop. Thus, for the stop to pass constitutional muster, Officer Pein must have had reasonable suspicion to conduct the dog sniff.

Again, the Government argues that the basis for Officer Pein's reasonable suspicion to conduct the dog sniff was: (1) Mr. Harris's drug history; (2) his nervousness

9

when asked about his drug history; and (3) his presence in a high drug trafficking area. These are all certainly relevant factors in determining reasonable suspicion. See United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005) ("a prior criminal history is by itself insufficient to create reasonable suspicion . . . But in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus."); United States v. Reed, 402 Fed. Appx. 413, 415–16 (11th Cir. 2010) ("the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis. Additionally, 'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.'") (citations and quotations omitted). But considering these factors cumulatively and the totality of the material circumstances, the Court cannot find that Officer Pein had a particularized and objective basis for suspecting that Mr. Harris was engaged in criminal activity.

Beginning with Mr. Harris's drug history, as noted above, this is a relevant factor but not sufficient by itself. Indeed, courts have cautioned that "[e]ven people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches." Santos, 403 F.3d at 1132. Here, Mr. Harris's prior criminal record was hardly extensive and Mr. Harris did not lie about it. See id. at 1132-33 ("when the individual lies about having a criminal history, the inference of wrongdoing is all the more powerful."). Thus, the Court does not find that Mr. Harris's drug history contributed substantially to creating a reasonable suspicion of criminal activity, and Officer Pein clearly needed more to justify the dog sniff. The only other information he had, though, is information that he would likely have during every single stop he makes: nervousness and presence in a high crime area.

As courts have repeatedly noted, "[i]t is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer." United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997).[2] And according to Officer Pein, the entire city of Wilton Manors is a high drug trafficking area. That is to say that Mr. Harris was not observed travelling from an especially well-known crime hot spot in the middle of the night, he was merely present within the city limits during rush hour. Cf. United States v. Lewis, 674 F.3d 1298, 1300 (11th Cir. 2012) (reversing district court's order granting motion to suppress in part because the detention at issue "took place at night in a high crime area"—the parking lot of a restaurant which nobody disputed was "a 'hotbed' of drug and gun activity."); United States v. Fields, 178 Fed. Appx. 890, 892 (11th Cir. 2006) (holding that an anonymous "tip, along with Fields' presence at a house known by officers in the area for high drug activity, a short distance from the intersection described by the informant, and Fields' evasive behavior in first driving away in an accelerated manner from three marked patrol cars and then later walking away and ignoring Deputy Bruster's attempts to get his attention, [was] sufficient for a finding of reasonable suspicion.").

Thus, if the Court were to find that Officer Pein had reasonable suspicion to conduct a dog sniff based on the facts of this case, Wilton Manors Police Department officers would have carte blanche to conduct warrantless searches on anybody in the

---

[2] In Brent v. Ashley, 247 F.3d 1294, 1302 (11th Cir. 2001), the Eleventh Circuit relied upon Wood for the proposition that "nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on ... nervousness ... as a basis for reasonable suspicion ... 'must be treated with caution.'" See also United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990) (finding "that the factors cited by the district court in this case, e.g. being Mexican, having few pieces of luggage, ***being visibly nervous or shaken during a confrontation with a state trooper***, or traveling on the interstate with Texas license plates (not yet a crime in Alabama), d[id] not provide a minimal, particularized basis for a conclusion of reasonable suspicion on the part of Officer Guthrie.") (emphasis added).

11

city they stop who exhibits any degree of nervousness when confronted and is unlucky enough to have even one prior criminal conviction. Such a finding would effectively render the Fourth Amendment a nullity to a sizable portion of that community.

The Government cites only a single case in support of its argument that Officer Pein had reasonable suspicion to conduct the dog sniff: United States v. Simpson, 609 F.3d 1140 (10th Cir. 2010). There, the court did note that a criminal record and nervousness contribute to the reasonable suspicion analysis. But in Simpson, there were a total of "fifteen facts that formed the basis of [the law enforcement officer's reasonable] suspicion":

> 1. Mr. Simpson was driving well below the speed limit;
> 2. Mr. Simpson had his windows rolled down on a very hot day;
> 3. Mr. Simpson appeared to be avoiding Trooper Bowles by twice changing lanes;
> 4. Mr. Simpson had a butane lighter and refills in the car;
> 5. Mr. Simpson had energy pills in the glove box;
> 6. Mr. Simpson had a radar detector that it looked like he was hiding;
> 7. Mr. Simpson was so nervous that his whole body was shaking;
> 8. Mr. Simpson's nervousness did not subside when Trooper Bowles told him he was only to issue a warning;
> 9. Mr. Simpson said he stayed in Reno a few days, but given the time frame he gave Trooper Bowles, the most he could have stayed was one night;
> 10. Mr. Simpson's trip was economically infeasible, given the high price of gas, the distance traveled, and the amount of time Mr. Simpson spent in Reno;
> 11. Mr. Simpson gambled at his friend's house instead of the casinos;
> 12. Mr. Simpson seemed vague in answering questions;
> 13. [Trooper Bowles' drug-sniffing dog] tried to shred his reward toy, which Trooper Bowles had only observed once before, when there was a person in the car who was found with marijuana;
> 14. Mr. Simpson was driving on a major drug corridor from a place where drugs often come from to a place drugs often go to; and
> 15. Mr. Simpson had a previous drug running charge.

Id. at 1145. Even on those facts, the court ruled that it was a "close call," but ultimately found that there was a reasonable suspicion that criminal activity was afoot in part

12

because the defendant "act[ed] extremely nervous in a situation where others typically relax, and provide[d] evasive answers that describe[d] a fairly implausible travel plan." Id. at 1153. In contrast, the Court cannot find here that Mr. Harris acted "extremely" nervous, and again, he was not evasive or untruthful.

In sum, because the record is devoid of any other suggestion of criminal activity or suspicion, the totality of the material circumstances failed to provide Officer Pein with a particularized and objective basis for suspecting that Mr. Harris was engaged in criminal activity.

### III. Conclusion

In light of the foregoing, it is **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress Search of Vehicle and Seizure of Evidence [DE 29] is **GRANTED**.

**DONE AND ORDERED**, at Fort Lauderdale, Broward County, Florida, this 2nd day of November, 2018.

JAMES I. COHN
United States District Judge

Copies provided to counsel of record via CM/ECF